Our final case for today is Gujarat Fluorochemicals Ltd. v. United States, docket number 24-1268. Counselor Drake, you have reserved five minutes of time for rebuttal. Is that correct? All right. You may begin. Good morning, Your Honors. May I please report, Elizabeth Drake of Chagrin Associates on behalf of the Independent Appellant Deakin America, Incorporated. This case has one important legal issue that is presented to this court. Can commerce permissibly interpret its regulations to find that a non-physical input, such as electricity, is an input product that is primarily dedicated to production of a downstream product? Our position is yes. The trade court below erred by ruling that as a matter of law, only an upstream product that bears a close physical relationship to the downstream product may be considered primarily dedicated to the production of that downstream product. The trade court stated that because energy is of universal application... Did you say that the court ruled with respect to upstream products? It ruled that electricity is not among the input products that can be covered by the attribution regulation for input products. Per se? You think they said that per se? I believe so, Your Honor. I don't read it that way. I mean, I think that they were emphasizing the fact that the electricity was used to make many different products for more than one product, at least in the production facility. So at page 1336 of the opinion, the court says they are not ruling on the issue of whether it can be a downstream product, singular or downstream products, plural. Instead, they said because energy, by its very nature, can be used for many different products, it cannot be primarily dedicated to a downstream product, however defined, a single downstream product or multiple downstream products. I hear what you're saying. But a lot of the sentences at the end of the opinion, where they talk that, make that determination, I don't see them necessarily having a per se rule, although I can understand the confusion you're mentioning. Yes, the fact that the decision is based on the nature of energy, that it can be used for many different end uses, makes it into a per se rule. And the fact that the court remanded directing commerce to eliminate the subsidy margin and not remanded to commerce to further justify its decision or explain how energy could be primarily dedicated, to me, supports the conclusion that it was a conclusion of law. The language where they say electricity cannot be shown on this record. They do say that. To be primarily dedicated. Right. That's right, Your Honor. But they also say that it is energy and being of universal application is not remotely describable as an upstream product that is primarily dedicated to the production of the downstream product, as is required by the regulation. In this case, in this case. I mean, it doesn't say in this case, but how do you know that this isn't about this case, since this case is the one they're ruling on? So in this case, Your Honor, if the, if the opinion was not a ruling of law, but focus on the facts of this case and the facts of this case, no one disputes that 100% of the energy that IWL produced was sold to GFCL for the production of downstream products. The CIT say that's not sufficient because it has to be primarily dedicated to the downstream product per the regulation. But that, that is not the basis of the decision, Your Honors. On page 1336 says it's unnecessary for the court to decide whether the term downstream product plausibly could refer to a group consisting of all downstream products or a single downstream product. So the court specifically said, we are not deciding that issue. We are deciding that because of the nature of electricity itself, it cannot be primarily dedicated to a downstream product, however defined. If we disagree with your reading of the decision below, what is your response to that? I mean, do you, do... That the decision should still be reversed because first of all, 100% of the energy was dedicated to the production of downstream products. It was in fact dedicated. And so the regulation says downstream product, singular at the beginning and downstream products, plural at the end. One USC section one says that singular terms and plural terms may include one another. Commerce uses the singular and the plural interchangeably in the preamble to the regulations. And commerce in the prior decision online paper from Indonesia clarified that even the singular term domestic, excuse me, downstream product may refer to automobiles. It may refer to Ford cars. It may refer to specific models of Ford cars. So the term downstream product, even in the singular is not the same as the term subject merchandise. And that's a very important distinction. Commerce could have used the words primarily dedicated to subject merchandise in the regulation, but it did not. So if the, to borrow from the hypothetical that your opposing council uses three times in the brief, if there's a tiny, tiny amount of electricity, which is just thrown onto the grid in the factory. And by calculating the amount of electricity is used for each of the products, only 1% of that tiny amount of electricity is used to produce this particular product. Still the entire subsidy is charged against the product. Is that your position? Yes, Your Honor. And that is fair because Your Honor, that is taken into account in commerce's calculations because they attribute the subsidy to the input product and the downstream products, plural. So the denominator of the calculation includes all of those downstream products. But if the product, if the factory makes every other product for domestic consumption, and only this one product for exportation that you would have, and this is a whopping margin. This, this countervailing duty margin is what, 26% or something like that. And that would come from 60 cents worth of electricity spread over 30 products. Yes, Your Honor. And that would strike me as quite so odd as to be almost per se, an unreasonable construction of the regulation. Why is it reasonable? Explain to me in what universe that makes sense. It's reasonable because that was the benefit amount that was calculated. That was not disputed or found to be an error by the court below. That was the amount of the subsidy for the land. That was the amount of the subsidy for the land allocated across all of the products that benefited from it. And only... What's the justification for that if only one of the products is being exported? Because that actually is a conservative approach. It dilutes the benefit. If you only included the subject merchandise in the denominator, you would have a much higher subsidy margin. By including all of the downstream products in the denominator of the calculation, you are diluting the benefit across all of those products. And that's found to be 36% across all or 26% across all of those products. So that is actually a methodology that ensures that if it is benefiting more than one downstream product, that all of those downstream product sales values are included in the denominator, which thus results in a lower subsidy rate than would otherwise be the case. So that's what makes it logical for commerce to match the universe of downstream products used in the benefit calculation to the universe of downstream products looked at in the attribution regulation. Why would we look at this part where it says a primary purpose is to be for incorporation in a particular downstream product? Look at that in terms of the subject merchandise. It seems like everything in CBD law and anti-dumping law, you have to have a connection to the product that's under investigation. Here, it seems like your argument takes us away from that. Your Honor, no, the subject merchandise is included in the downstream product. But so is other merchandise. Exactly. And that happens all of the time where. Yes. That's why, as I said, it seems to me that in dumping law and CBD law, you have to show a nexus to the subject merchandise because, you know, one company can be producing a myriad of things. Talking about magnets, only a certain type of magnet may be subject to the investigation. Why would this be different here? So it's a difference between the dumping law, which focuses on the costs and prices of specific subject merchandise, and the countervailing duty law where subsidies might not be tied to the specific subject merchandise. Subsidies might be received by a company that produces all kinds of products. And so the way that commerce. At some point, you have to tie it to a product. It has to relate to that. And in this case, that relationship is called what? It's called primarily dedicated. Correct. Exactly. It's primarily dedicated. And that. To the production of downstream products. And I take it those downstream products is the one that's being investigated. Correct. The PTFE chemical product is among the downstream products that benefited from the fact that IWL, subsidized by the government of India, produced energy and provided 100% of that energy to the producer, Lujarat, of both PTFE, the subject merchandise, and other chemical products. But the argument you're making now, it seems to me, it brings us back to the singular plural issue because it depends on the word product to be interpreted to mean all products that are downstream of the electricity, right? In this case, it was. In the other cases that were cited in the CVE preamble, such as the lumber case, the timber was being provided to produce lumber. The lumber producers also produced sawdust, chips, other products that were also sold. It was still found to be primarily dedicated and used as an illustrative example of how commerce would determine whether or not an input was primarily dedicated to the production of a downstream product. But that seems to me doesn't necessarily answer the question that would be raised if the downstream product were sawdust, if sawdust was only 1% and the timber and lumber were 95% of what was produced by the factory. Let me ask you a process question here. I notice there's an empty chair over there. Normally, I would expect to see the government in the position of the commerce department. They're not here. They have not taken an appeal. Do you know why? Let me ask the question this way, because I normally, and I would say pretty much exclusively, when the government loses a case in a court, including the CIT, the case has to be processed through the Solicitor General's office, the Department of Justice, and the Solicitor General says either go or don't go. Now, I have no idea what the process was in this case, and maybe you can enlighten me, but normally, if the government doesn't show up, that's an indication that the Solicitor General's office decided not to take an appeal. Yes, Your Honor. I cannot speak to the decision-making process. I know that the remand was filed under respectful protest. I know that there have been other cases where the defendant intervener has appealed to this court, commerce has not participated for whatever reason, and the defendant intervener has prevailed. So perhaps the judgment of the Solicitor General as to the merits of the case is not always the same as the judgment of this court as to the merits of the case. And so that's why defendant interveners have the right to bring an appeal regardless of whether the government appeals. So this regulation we're looking at, it's been changed, right? In December, yes, there were revisions. And one of those revisions was to specify that electricity, energy, etc. can be one of the inputs found to be primarily dedicated to the production. Commerce in that regulation kind of tries to address at least in part this case or what's going on here. Correct. So the decision we have will have effect only with respect to the prior regulation, correct? Yes. Do you know if there are other proceedings under that regulation that are still pending? Yes, it only went into effect in December. No, I mean the prior regulation. Oh, possibly, yes. But you're not aware of any? I would believe, yes, there would still be one because the new regulation only went into effect recently. So, yes, there are existing proceedings. Are you aware of proceedings? There must be dozens, hundreds of reviews that are going on. I don't know which ones necessarily involve this particular regulation, but the new regulation only went into effect very recently. And so usually an administrative review takes longer than a year, an investigation takes longer than a year. So there would be many that are still pending that would not be impacted by the new regulation. And I take it that the new regulation doesn't have retroactive effect. No, that's only. So everything that is involved in this case is purely the old regulation. That is how I believe. There's a fixed duty which will either be paid or relieved. Correct. And I believe, Your Honor, one of the reasons that this court's opinion is so important in this case is that now that the new regulation is in effect, once it is imposed on an energy input, I believe respondents would say, but the CIT says energy is of universal application. It cannot be considered primarily dedicated because the new regulation still has the language primarily dedicated. So this I wanted to ask you this question before you sat down. And I know you're out of time. You're well into rebuttal time and all. But what difference does it make that in this case we're dealing with energy? Would it be the case that the same thing is true with respect to any third party input that deals with the consumable, something that's consumed in the manufacturing process like oil, water, gas, things of that nature? Yes. The court below seems to be saying that if the input is capable of being used in other products that are not among the downstream product, then it cannot be primarily dedicated. So even if, in fact, 100 percent of the input is used in the downstream product, if in theory it could be used in other products under the lower court's view, it cannot, by definition, be found to be primarily dedicated. So the fact that it's energy here really doesn't matter? Excuse me, sir? The fact that it's energy in this case doesn't matter. He does talk, the court below does talk a lot about having a close physical relationship and being part of a link in the production chain, etc. So there did seem to be some concern about being a physical input rather than a non physical input. But there was also this concern about it has to be something that can only be used for the downstream product, regardless of the factual situation. If it could have theoretically been used to produce something else, then it cannot be primarily dedicated. If we don't read the language, is that restricted? And one last question, for me anyway, the price charge between the electricity manufacturer and the primary product man, was that a market price? That price was not relevant, Your Honor. Because the benefit calculation was based just on the price paid for the land, the subsidized land, compared to a market benchmark for that land. That was the subsidy benefit. And then the benefit was divided over the combined sales of the input producer and the downstream producer, eliminating intercompany. So the subsidy conferred in this case was land? That's correct. It was the provision of land to the electricity producer. But to follow up on Judge Rainier's question, if they paid market price for the electricity, then I'm not sure I understand why that isn't an important factor cutting against the imposition of a duty. That would be a factor under upstream subsidy analysis. Why isn't it a factor here? Because the electricity producer and the chemical producer are cross-owned. And so Commerce said, because they're cross-owned, they can basically use each other's assets however they want. Right. But if the use of the asset by the downstream manufacturer is at market cost, where's the benefit? The benefit is that the benefit went to someone. We don't know if it went to the electricity producer or to the chemical producer. The fact is they're cross-owned. And so you're saying that I infer that what you're saying is that because the cross-owned companies as a whole got a subsidy, that the fact that they didn't use the subsidy to produce the lower cost electricity doesn't matter because they got X amount of money and it benefited them generally. Exactly. And Commerce is instructed by the statute not to look at what the effect of the subsidy is. Who gave it to whom? The fact that they're cross-owned and they got a subsidy means that that subsidy needs to be revealed. Otherwise, everybody would be setting up third party corporations and breaking up. And that's exactly why Commerce promulgated this rule is to prevent the circumvention of the countervailing duty law by a company spinning off as a separate corporate entity. It's provider of electricity. It's provider of water. It's provider of other inputs and shielding subsidies to the production of those inputs. But that would apply in the upstream subsidy setting as well, wouldn't it? Well, they would have to be separate, totally separate, not cross-owned. Here, you could just name it company A, company B, but we're still cross-owned and we can still enjoy each other's assets. Upstream subsidy provision only applies when there's no cross-ownership. Their upstream subsidy provision comes from the statutory. Exactly. And is this downstream analysis? Is it only regulatory or is there any statutory basis for it? So the statutory basis is that the countervailing duty statute says that Commerce shall countervail subsidies provided, whether indirectly or directly, with relation to the subject merchandise. And it further says that Commerce shall not take into account whether it's indirect or direct and shall not countervail a subsidy merely based on what effects it might have. It doesn't have to measure the effects of the subsidy in order to countervail it. So those statutory directions... That's just the basis for the regulation? Yes, because Commerce was concerned that if it allowed companies to remain cross-owned, but to shield some of those subsidies from countervailability, it wouldn't be fulfilling its statutory mandate to countervail all subsidies provided, whether directly or indirectly, to a subject merchandise. OK, we thank you for your... Thank you for your indulgence. All right. Counselor Quahy? Did I get it right? Very close, Your Honor. Good morning. Still morning. If they might please record, my name is Diana Quahy, representing the plaintiff at Valencia. So let me ask a question based on the last exchange with your opposing counsel. Is it the case that under the statutory upstream subsidy, that if you have a large subsidy that's given to a company in which there's cross-ownership, that is not taken into account in determining the countervailing duty? Do you understand the question? No, I'm not sure I understand. What I was understanding, counsel, to say is that in the cross-ownership setting, that the regulation takes cognizance of the cross-ownership and treats them effectively as the same thing. But I thought I understood her to say that that's not true of the statutory upstream subsidy, so that even though they are cross-owned, the two companies are treated as entirely separate. And therefore, a subsidy to A is not attributed to B. I think the difference between when commerce may investigate a subsidy under the upstream subsidy statute versus the cross-owned regulation that we were talking about, you can have, yes, it depends on affiliation. Commerce has said in the preamble to the CBD regulations that when you have cross-ownership, you can go under this regulation. But I'm asking about the statute, the upstream subsidy statute. Does that, in effect, not apply to interrelated companies or what am I missing here? I had the impression that that was not the case. But counsel seemed to be saying that that's the way the statute works. So the upstream subsidy statute does not have a restriction on whether the two companies are cross-owned or not. In fact, they can be affiliated and a subsidy can be investigated under the upstream subsidy statute, even if the companies are affiliated but not cross-owned. The major difference between investigating a subsidy under the upstream subsidy statute is that there are additional tests that the law has included. So, for example, the upstream subsidy includes a determination of competitive benefit, includes a determination of whether it is a substantial cost. The subsidy represents a substantial cost of the downstream product. So it is essentially the path that commerce has taken here is it is, in some respect, a simpler path because all that commerce has to show is that the subsidy is primarily dedicated to the downstream product. Products, according to the appellant here, right? Well, that is not the text of the regulation, Your Honor. Well, I understand, but the argument based on 1 U.S.C. 1 or whatever it is, is that that's what the regulation means. Well, the regulation cannot be read in that manner because it would be inconsistent with the overall definition of the subsidy and essentially in Section 701A. So Section 701A talks about commerce imposing countervailing duties based on the net countervailable subsidy provided directly or indirectly, but with respect to the manufactured production or export of a class or kind of merchandise. So it is not the downstream product, but a class or kind of merchandise. The statute then continues to say that if the ITC also determines that there is an injury to the domestic industry by reason of import of that merchandise, then there shall be imposed upon such merchandise a countervailable duty. So the structure of Section 701 of the Tariff Act indicates, expresses this fundamental principle that the countervailable subsidy is tied to a class or kind of merchandise. So what I understood opposing counsel to be arguing is that there's some sort of mathematical approach to it where you determine the percentage that would apply to the subject merchandise by looking at all of the downstream products. What's your response to that? I believe that we need to take a step back because what counsel is suggesting is true when you're looking at the calculation of the subsidy for the respondent, not for a cross-owned affiliate. So commerce normally attributes a subsidy to the products produced by the entity that receives the subsidy. So in that case, let's say GFCL, GFCL produces multiple downstream products. And as counsel has said, yes, the denominator will include all of those products. But that is the case for GFCL, the company that produces the subject merchandise, PTFE resin. What is happening here is that a cross-owned affiliate that is in a completely different business, it does not produce PTFE resin, rather it's in the business of producing wind turbines, happens to sell an incidental amount of electricity to its cross-owned affiliate. Now, the argument that counsel made, again, it's applicable as far as GFCL's denominator. I would understand it there. But when it comes to a cross-owned company, we first have to see if that electricity input is primarily dedicated. Then in the second step, if it's primarily dedicated, we will attribute that subsidy over the denominator that includes all of the products. But essentially, counsel is skipping the first step of the regulation, which says the input from the cross-owned company has to be primarily dedicated. Well, dedicated to what is where the runner meets the road? Yes. Because if it's to every product they produce, then they almost per se satisfy the regulation. If it's to one product, then that's a tougher sell. Yes, Your Honor. But textually, the regulation itself does say product. The regulation itself. Now, if Commerce's regulation itself would have used class or kind of merchandise, that would have solved the conundrum. But it doesn't. It uses downstream product. Because it's singular, is what you're emphasizing? Yes. But how do you respond to the point made that it doesn't say subject merchandise? Because Commerce could have chosen to use that language, and that would have been more clear as well. It's true, but the regulation has to be read in a harmonious way with the statute. So the fact that Commerce selected to use downstream product, the only way to read that in a harmonious way with the statute is to read it as subject merchandise. And in fact, it is also the way it is described in the CBD preamble, doesn't suggest that it would apply across a multitude of products of, you know, all the downstream products. The CBD preamble also supports the interpretation that it is the product at issue. And you're talking about the plastic automobile and appliance example. Yes, that is a particularly good example. But also the way that Commerce explains what is the purpose of the subsidy. Can I ask you about the plastic example just for a minute while you're thinking about that? And the plastic example, the emphasis there for why it doesn't apply is because the plastic is used for two different things. Is that how you read it? Or is there something else that I should be understanding from that example? No, it's also the fact that plastic is versus appliances or versus automobiles. You don't have that strong connection as you would have in the case of timber being used in the production of lumber or semolina being used to make pasta or in the case of the Indian plastic for a particular device, say a laptop of a particular kind made by a particular manufacturer. Well, again, it is dependent on each case. So in that particular case, you'd have to see if, you know, that plastic was considered a link in the production process, which is another term that the CBD preamble uses. Primarily directed to, that's the language that a regulation uses. So why do we have to look at link? Why wouldn't we just say this plastic is being made specifically for this product? It's primarily directed to the production of a particular kind of laptop. And there could be actual situations where that could be true. But as a general proposition, I think what the CBD preamble is trying to say is that plastic is not going to be, it's not by definition primarily dedicated to an automobile production or to an appliance. Do you believe the CIT's decision to say electricity can never be primarily directed to the creation of anything? No, it is in this specific case, Your Honor, because the facts here are quite extreme. The electricity provided was incidental to IWL's production itself. And the quantity of the electricity that was sold was minute. The question is, that electricity can it even be traced all the way to the production of such a merchandise? De minimis, the amount of electricity used, wasn't it at the end of the day just considered de minimis? Because it wasn't much at all, was it? It was the excess electricity from the production of wind turbines. It was essentially, it was the electricity produced by two prototype turbines that they were testing. Yes, so essentially testing the turbines itself goes to the core production of IWL, which is not the production of electricity. Their core production is to make wind turbine generators. The subsidy that they got from the SIDC was a lease subsidy for production of turbines, not of electricity. Electricity was incidental to their main production of turbines. And the phrase link in the overall production chain, that's actually taken out of the CBD preamble. That's correct, Your Honor. Yes, so that this was one of the ways that the CBD preamble, so if it's not clear what the regulation says, what primarily dedicated is just on the face of the regulation, the CBD preamble has these helpful examples to indicate what is considered to be primarily dedicated and how commerce is going to make this determination in cases going forward. And there have been other cases where commerce indeed has found, for example, you know, in there's one case that involves a Korean steel producer, POSCO, and one of its cross-town affiliate, POSCO Plantek. POSCO Plantek produces equipment that it sells for multiple types of jobs. It's not dedicated specifically to steel production. And that is exactly what commerce found. That production, that equipment is not dedicated to steel production. It can be used in multiple type of industrial projects. So it is not primarily dedicated. So there are multiple examples in commerce's practice that we have tried to illustrate in our briefs of what is primarily dedicated and what is not. And the electricity here, the facts here are just so extreme that we would ask the court to sustain the CIT's decision. Okay. Thank you for your argument. I'm sorry. Any other questions? No. Counsel, we restore your rebuttal time. Thank you, Your Honor. I greatly appreciate that. First of all, going to the downstream products singular, downstream products plural. Commerce has used them interchangeably. And in the CBD preamble, talking about what the purpose of this rule is, it highlights the lumber case, it highlights the POSCO case. And it says, we believe that in situations such as these, the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products plural. So we believe that it is consistent with the way that commerce established the regulation to read downstream product singular and downstream products plural as interchangeable. How do you view the third example in the preamble of the plastic automobile appliance? It's a very short example to attribute subsidies to a plastics company to the production of cross-owned corporations producing appliances and automobiles. So it's not clear exactly what that situation would be. It sounds to me like if the plastics company is providing it to one company that produces automobiles and another company that produces appliances, and your case is on appliances, it's not being primarily dedicated to the appliance producers downstream products because it's also being sold to the automobile producer. And so, but in our case, 100% of the energy is being provided to the producer of the PTFE, who also produces other downstream products with that energy. So it's distinguishable from a case where a plastics company has two separate producers, one of automobiles. It doesn't say separate. It doesn't say that. You're inferring that. Because that's how I understand it. It's not, I agree, it's not completely clear. Do you have a citation to the statute that gives commerce the authority to promulgate the regulation that we're dealing with? Yes, Your Honor. That would be 1671A, 19 U.S.C. 1671A, that requires commerce to impose a countervailing duty on merchandise that if it finds that the government is providing directly or indirectly a countervailable subsidy with respect to the manufacture, production, or export of that merchandise. Okay, thank you. And I would just like to quickly address the example that Ms. Quiet raised of the Cold World Steel case on Korea, where they found that the subsidies to the input producer were not primarily dedicated to the downstream product because those input products were, in fact, being provided to other uses and not just to the downstream product producer. That is distinguishable for this case, where the 100% of the energy was, in fact, sold solely to the downstream producer that produced PTFE. And so this is a consistent way of reading the regulation to actually look at the facts of each case and not just the theory of whether the input could have been used for other uses. Here, commerce based its decision on the facts, it was supported by the facts, and therefore we believe the CIT was in error in setting that cycle. Thank you. Well, we thank the parties for their arguments. This court now rises in recess.